UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

        Plaintiff,                    **CRIMINAL NO.  07-CR-20627**

v.                                **HON. MARIANNE O. BATTANI**

**D-2 SCOTT K.  BRADLEY,**

        Defendant.

_____/

**GOVERNMENT'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD DEPARTURE**

The United States, by and through its attorneys, TERRENCE BERG, United States

Attorney, THOMAS DUKES and MONA SEDKY SPIVACK, Trial Attorneys for the United

States Department of Justice's Computer Crime & Intellectual Property Section, hereby submit

this Sentencing Memorandum and Motion for a Downward Departure.

**The Charges and Description of the Offense**

On June 22, 2009, Scott K. Bradley, 38, a resident of West Bloomfield, Michigan,

pleaded guilty to Counts 5, 6, 13, and 28 of the Indictment.  Count 5 charged a conspiracy to

commit wire fraud, mail fraud, and to violate the CAN SPAM Act, in violation of 18 U.S.C. §§

371, 1341, 1343, 1037(a)(2) and (a)(3).  Count 6 charged a violation of the CAN SPAM Act,18

U.S.C. §§ 1037(a)(2), (b)(2)(C).  Count 13 charged wire fraud involving a financial institution,

in violation of 18 U.S.C. § 1343.  Count 28 charged money laundering, in violation of 18 U.S.C.

§ 1957.

In December 2007, Bradley was indicted, along with 10 other individuals, for his role in

1

a criminal conspiracy to carry out an illegal e-mail stock market manipulation, or "pump and dump,"scam. As set forth more fully in the indictment, from in or about May 2005 through September 2005, Bradley conspired with co-defendants Alan Ralsky, his father-in-law, Judy Devenow, John Bown, William Neil, Anki Neil, James Fite, James Bragg, and Peter Severa (who comprised the mailing operation), along with co-defendants Francis Tribble and How Wai John Hui (who comprised the market manipulation/stock promotion operation), in order to send tens of millions of "spam," or unsolicited bulk commercial e-mail messages, each day that touted certain thinly traded Chinese penny stocks.  The spam campaign artificially increased the stock prices, as the recipients of the spam responded to the advertisements by purchasing the touted penny stocks.  The co-conspirators and their Chinese-based clients then sold their large blocks of stock at these artificially high prices, garnering tens of millions of dollars in stock sale proceeds. The Indictment identifies nearly $3 million in illegally-derived proceeds from this scheme.  The co-conspirators transferred these proceeds into and out of accounts with financial institutions in Hong Kong, China, and the United States.

Bradley and his co-conspirators used illegal techniques to send their stock spam in an effort to evade anti-spam filters and ensure that the spam successfully arrived in the recipients' e-mail in-boxes.  For example in their outgoing stock spam, the co-conspirator mailers inserted false information into the "from" lines in the e-mail's return address, or "header," that falsely identified the sender of the spam.  They also sent the stock spam through "proxy" computers, which involved relaying or "bouncing" the e-mail through the computers of other people without authorization.  The use of these proxy computers disguised the true identity of the sending computers' Internet Protocol addresses by replacing them with the Internet Protocol addresses of

the proxy computers.  In addition to using false headers and proxies to send their spam in

violation of the CAN-SPAM Act, Bradley and his co-conspirators sent spam e-mail messages

that contained materially false and misleading information or omissions.  For example, in some

instances, the spam falsely claimed that the touted stock involved an "initial public offering."  In

others, the spam did not contain the required disclaimers that disclosed the identities and

ownership interests of the sellers and senders of the spam.  Bradley was aware that interstate

wire communications, the U.S. mail, and common carriers were used to further the fraudulent

scheme.

### Bradley's Role in the Conspiracy

Bradley worked in tandem with his father-in-law, Ralsky, as one of the key players in the

spamming operation.  As the "de facto" Chief Financial Officer of the business and Ralsky's

right-hand man and confidante, Bradley was responsible for setting up the operation's bank

accounts, ensuring that their clients paid them the monies they were owed for their spamming

activities, and ensuring that their expenses were paid.  Bradley controlled and had signatory

authority over the Superior Distributing bank account, which was the principal operating account

for the spamming operation.  Bradley used his PayPal, credit card, Superior Distributing, and

other accounts to pay for various spamming-related expenses, including for bandwidth, for the

false domain registrations that were used by the spamming operation, and the like.

Bradley played a significant operational role as well.  He helped Ralsky find the clients

on whose behalf to send spam, as well as find other mailers to spam for them.  Bradley would

frequently communicate with prospective clients and prospective mailers and negotiate terms of

engagement on behalf of the conspiracy.  He decided how much the mailers would be paid,

helped farm out the spam campaigns to the various mailers, and facilitated their payment. Bradley also helped Ralsky find and purchase sources of "proxies," as well as the spamming software that allowed their mailers to use "proxies" and false headers in an automated fashion.

In or about the spring of 2005, Ralsky, Hui and Tribble met and agreed that Ralsky and his spamming operations would send spam that promoted certain Chinese penny stocks in order to drive up the stock price, so that they could unload large blocks of their clients' stock and in turn earn significant profits. Per their arrangement, Ralsky received a percentage of the profits generated from selling the touted stock, earning additional bonuses when certain target stock prices were hit. Hui, who entered a guilty plea on December 16, 2008, to Counts 5, 13, and 28 of the Indictment, was the CEO and major shareholder of China World Trade (ticker symbol "CWTD"), one of the first Chinese companies to have its stock price manipulated in the conspiracy. Tribble, who entered a guilty plea on October 17, 2008, to Counts 5, 13, and 28 of the Indictment, was an experienced stock promoter and market manipulator who had a preexisting business relationship with Hui and with the U.S.-based stock broker who executed the stock trades on behalf of the conspiracy. Devenow, who entered a guilty plea on October 14, 2008, to Counts 5 and 6 of the Indictment, was a key mailer for the spamming operation and helped manage other mailers. After seeing how successful Ralsky's spamming efforts were in driving up the stock price of CTWD, Hui and Tribble brought other Chinese clients to Ralsky to promote, and inflate the prices of, their companies' stock. These included China Digital Media Corporation (ticker symbol "CDGT"), Pingchuan Pharmaceutical Inc. (ticker symbol "PGCN"), and World Wide Biotech & Pharmaceutical Company (ticker symbol "WWBP"), among others.

Bradley, as the person responsible for managing the financial end of the operation,

actively monitored the brokerage accounts to verify the trading activity, and he would regularly report this activity to Ralsky.  He communicated regularly with the stock broker, and demanded that he be informed of daily trading activity and stock sale proceeds.  After the proceeds from the stock trades were deposited into the straw man nominee accounts, they would next be wired to Hong Kong and other overseas banks, and from those banks to Bradley's Michigan bank account, for distribution to other co-conspirators.  Bradley, Ralsky, Hui, and Tribble regularly exchanged numerous emails during the course of the conspiracy to discuss the timing of the spam campaigns, the timing of the "news releases," as well as the distribution of proceeds from the stock sales following the spam campaigns.  Bradley also played a role in putting together the false and misleading advertising content that appeared in the spam touting the various stocks. For example, he wrote the false "initial public offering" claim and instructed the mailers to include that false claim in the spam.

Throughout the conspiracy, Bradley was a member of the control group that consisted of co-conspirators Ralsky, Judy Devenow, John Hui, and Frank Tribble.  Bradley was copied on significant emails, attended group meetings in Las Vegas, and participated in key decisions regarding the operation of the stock market manipulation conspiracy.  As such, Bradley was privy to detailed information about the inner workings of the pump-and-dump scheme.  Bradley earned significant income from his involvement in the conspiracy, in large part because he was paid a percentage of the stock sale proceeds, rather than a salary.  Financial records obtained during the course of the investigation of this case indicate that Bradley earned between approximately $400,000 and $1 million dollars during the course of his involvement in the conspiracy.

The evidence supporting the above facts consists primarily of internal email and electronic chat communications among the conspirators, records and documents seized from the conspirators, bank records, expert analysis of emails sent during the spam campaigns, and information obtained from cooperators.

### Guidelines Calculation

Bradley has a base offense level of 7, with a 14-level increase based on his $400,000-$1 million gain from his illegal activities. Records seized in the investigation show that Bradley was paid a significant percentage of the stock sale proceeds during the course of his involvement in the conspiracy during the spring and summer of 2005. His adjusted gross income for 2005 was between $400,000 and $1,000,000 and his sole source of income was his spamming activity. Because the loss to any individual spam recipient is virtually impossible to measure, the application of § 2B1.1(b)(1) of the Sentencing Guidelines should be based on the defendant's gain.

Bradley, like the other defendants, has a 2-level increase because the conspiracy involved mass marketing and more than 10 victims. Further, he has another 2-level increase because the conspiracy involved sophisticated means. These sophisticated means include Bradley's and his co-conspirators' use of complex mailing techniques that employed the use of proxies, false headers, and advanced spamming software that automated these features; the use of dozens of computer servers that frequently moved throughout the country and were ultimately based in California; the hiring of spammers located throughout the U.S. and in Russia and other countries; the involvement of Chinese individuals, companies, and banks to facilitate the scheme; and the transfer of funds from U.S. to Hong Kong to Chinese bank accounts. He also has a 1-level

increase because he was convicted under the money laundering statute. Finally, Bradley has a 3-level increase because he acted as a manager/supervisor of the conspiracy. As set forth above, he was the CFO of the spamming operation, he was in the inner sanctum of the control group, and he was Ralsky's right-hand man and confidante. In particular, Bradley at times directed Devenow, the stock broker, and a whole host of third-party mailers. The conspiracy charged in the Indictment involved five or more people and was extensive. Bradley has no relevant criminal history.

Based on the above factors, the plea agreement calculates the adjusted base offense level to be 29, with 3 points off for acceptance of responsibility, which results in a total offense level of 26 and a guideline range of 63-78 months. The plea agreement also requires the defendant to provide substantial assistance to the government, and it provides that, if the defendant does provide such assistance, the government will move for a reduction in sentence to 32 to 39 months.

<u>**Cooperation of Scott Bradley**</u>

In the plea agreement, Bradley agreed to provide substantial assistance by agreeing to testify, if needed, against Alan Ralsky and the other defendants who had not yet pleaded guilty: John Bown, William Neil, James Bragg, James Fite, and Anki Neil. Bradley agreed to be interviewed and to tell the truth about his own involvement in the charged conduct, as well as the involvement of others. At the time when Bradley agreed to cooperate, Alan Ralsky, Bradley's father-in-law and the "boss" of the illegal spamming operation, had shown no interest in pleading guilty or admitting his responsibility. The prime value of Bradley's cooperation was its impact on the case against Ralsky himself. As Ralsky's right-hand man, Bradley was extremely

knowledgeable about all of the key operations of the enterprise, the roles of the other significant participants, how they conducted their business, how much money they made. Ralsky would clearly fall if Bradley were to testify against him, and with Ralsky, the rest of the defendants would have to realize they had no chance to avoid being convicted. Almost immediately after Bradley agreed to cooperate, the attorney for Ralsky contacted the government and indicated an interest in working out a guilty plea. For this reason, the government believes Bradley provided substantial assistance. Bradley also agreed to testify if needed in the prosecution of others in connection with this case. It should also be noted that Bradley agreed to be interviewed, and was interviewed, by attorneys from the Securities and Exchange Commission.

As set forth in the PSR, the Probation Department calculates the guideline range as 63 – 78 months. The defendant executed a written Rule 11 Plea Agreement that contained this same guideline range. Pursuant to that agreement, the government is making make a motion to reduce his sentence under § 5K1.1 of the sentencing guidelines, because the defendant provided substantial assistance. Under the agreement, the government agreed that, if the defendant provided substantial assistance, the government would recommend a reduction in the guideline range to a range of 32 - 39 months.

By this memorandum the government brings to the attention of the court the facts pertaining to the defendant's offense and his subsequent cooperation. The government believes that in this instance, the defendant did provide substantial assistance, and that, consequently, he is eligible for a reduction in the guideline range. Therefore, the government does move pursuant to § 5K1.1 for a downward departure to a range of 32 - 39 months.

## CONCLUSION

For all of the reasons stated above, the government moves for a downward departure for defendant Scott Bradley.

Respectfully submitted,

TERRENCE BERG
UNITED STATES ATTORNEY

 /s/Thomas Dukes
THOMAS DUKES
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division


 /s/Mona Sedky Spivack
MONA SEDKY SPIVACK
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division

DATED:  November 13, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,

           Plaintiff,          **CRIMINAL NO.  07-CR-20627**

v.                          **HON. MARIANNE O. BATTANI**

**D-2 SCOTT K. BRADLEY,**

           Defendant.
                           /

## CERTIFICATE OF SERVICE

      I hereby certify that on November 13, 2009, I electronically filed the foregoing document with the Clerk of the Court using the Electronic Case Management system.

                       s/Terrence G. Berg
                       United States Attorney
                       211 W. Fort Street, Suite 2001
                       Detroit, MI 48226
                       terrence.berg@usdoj.gov
                       Bar No. P40295

                       s/Cheryl Bradford
                       Legal Assistant
                       United States Attorney's Office

10